IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS C. VAUGHAN and BRUCE H. CALLAHAN, in their capacities as shareholder representatives, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 06 C 3618 |
| AMERICAN HOMECARE SUPPLY, LLC, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In October 2004, American Homecare Supply, LLC (AHS) purchased Ultra Care, Inc. Ultra Care sells and rents home medical equipment and provides home infusion therapy as well as other specialty pharmacy services. Thomas C. Vaughan and Bruce H. Callahan, the representatives of Ultra Care's selling shareholders, have sued AHS for breach of contract. The two claims that Vaughan and Callahan have made involve payment of consideration due on Ultra Care's revenues that were uncollected at the time of the sale. Plaintiffs have moved for summary judgment on Count 1 of their complaint. For the following reasons, the Court denies plaintiffs' motion.

**Facts**

For the purpose of plaintiffs' summary judgment motion, the Court views the evidence in the light most favorable to AHS, drawing reasonable inferences in its favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

In October 2004, AHS purchased Ultra Care pursuant to a merger agreement. The

merger agreement required AHS to cause Ultra Care and its subsidiaries to endeavor diligently and in good faith to collect certain uncollected revenues of Ultra Care. *See* Def. Ex. A, § 3.2(a). The merger agreement set a collection target of $6.9 million for a fifteen-month period, from October 2004 through December 2005. In the event that AHS collected more than $6.9 million, AHS would pay the selling shareholders, through representatives Vaughan and Callahan, the amount that exceeded the target. If collections did not reach the $6.9 million target, then the selling shareholders would pay AHS the shortfall out of an escrow account established at the closing. The merger agreement required AHS to deliver interim collection reports to the shareholder representatives at the end of each quarter detailing the amount of uncollected revenues that were collected during that three-month period. The shareholder representatives did not dispute the figures in any of the interim reports.

The merger agreement required AHS to deliver to the shareholder representatives, within forty-five days after the fifteen-month collection period, a statement setting forth the amount of uncollected revenues that Ultra Care or its subsidiaries received over the entire collection period. *See* Def. Ex. A, § 3.2(c). If the shareholder representatives disputed the contents of the collection statement, they had thirty days to specify in reasonable detail the nature and extent of their disagreement. *See* § 3.2(d). Within that thirty-day review period, AHS was to provide the shareholder representatives with reasonable access to company records and employees. *Id.* If AHS and the shareholder representatives could not reach an agreement within ten days of notice of a dispute, the merger agreement provided for the engagement of a nationally recognized firm of independent accountants to review and resolve the dispute. *Id.* The merger agreement detailed no similar procedure for AHS to remedy a computational error that it discovered. Under

2

another provision of the agreement, if Ultra Care or its subsidiaries collected an amount in excess of the collection target, AHS would deposit the excess amount with the shareholder representatives' paying agent. *Id.* § 3.2(f).

On February 14, 2006, the forty-fifth day after the end of the collection period, Carmen Davies, the regional director of reimbursement for AHS, e-mailed to Vaughan the last quarterly collection report and the final statement for the fifteen-month collection period. Davies wrote that she was sending the collection statement in accordance with section 3.2 of the merger agreement. The February 14, 2006 statement computed the total collection amount to $9,385,857.47, which is $2,485,857.47 over the $6.9 million collection target. On February 23, 2006, Vaughan wrote to Stephen Ferrara, counsel for AHS, stating that the shareholder representatives agreed to the figures on the February collection statement and asked how the $2,485,857.47 would be distributed.

On March 3, 2006, Roger Miller, a Vice President for AHS's subsidiary DependiCare, sent Vaughan a corrected final collection statement, explaining that the February 14, 2006 final statement was incorrect. The March 3, 2006 collection report detailed the actual amount that Ultra Care collected, which was $7,801,205.12. As a result, AHS explained that the excess receivables were only $901,205.12, over $1.5 million less than the original final report had stated. The shareholder representatives responded to Miller's letter on March 13, 2006, informing AHS that the merger agreement did not allow AHS to revise or amend a collection statement and demanding that AHS promptly deposit $2,485,857.47 with the paying agent pursuant to section 3.2(f) of the merger agreement.

During the fifteen-month collection period, Andrew Miller, Ultra Care's former Chief

Operating Officer, regularly sent plaintiffs and the former members of the Ultra Care Executive Team collection statements to keep them and their fellow shareholders apprised of the actual amounts collected by AHS.[1]  *See* Def. Exs. C-J.  Andrew Miller also attests that he had discussions with plaintiff Callahan in June 2005 in which he explained that he believed the collection figures in the May 2005 interim report were wrong.  He advised Callahan that he had prepared his own internal reports, which he had forwarded to plaintiffs, and believed they were correct.  After Andrew Miller re-ran the reports through May 2005 several times and confirmed that his own internal reports were correct, he told Callahan and/or Brian Chung, the Ultra Care's former Chief Financial Officer, that he thought the difference between the amount reported in the May 2005 interim report and his own internal reports resulted from AHS running the collection report with an incorrect date range.  Andrew Miller believed that the computational error in the May 2005 interim report carried over to subsequent reports prepared by AHS, including the incorrect final collection statement sent on February 14, 2006.  He explained this to Callahan and Chung sometime after the final collection report was sent.

AHS contends that due to Andrew Miller's regular updates, the shareholder representatives were aware of the error in the collection reports when they received the February 14, 2006 final collection statement.  Despite being aware of the computational errors, AHS argues, the shareholder representatives tried to seize on the error and demanded payment of the erroneous figure, which AHS says includes a windfall of over $1.5 million.  AHS has offered to

---

[1] After the merger, Miller went to work for AHS, and he currently serves as Director of Corporate Inventory.  He attests that he did not apprise AHS that he was sending reports to the Ultra Care Executive Team and did not send anyone at Ultra Care copies of these reports until after the instant litigation was instituted.  *See* Affidavit of Andrew W. Miller.

pay the excess receivables amount of $901,205.12 listed in the corrected March 3, 2006 collection statement and has offered to have the corrected statement audited for accuracy. The shareholder representatives have declined these offers.

The shareholder representatives contend that summary judgment is appropriate because no issue of fact exists as to whether AHS breached section 3.2(f) of the merger agreement. AHS argues that contractual ambiguities in the merger agreement create genuine issues of material fact and therefore preclude summary judgment.

## Discussion

When a district court rules on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may grant summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

The shareholder representatives contend that because section 3.2(d) of the merger agreement provides that the final collection statement is "deemed final and binding" on AHS, AHS is stuck with the amount set forth in that statement and was not entitled to change or correct it. They argue that section 3.2(d) allows only the shareholder representatives, and not AHS, to dispute the computations in the collection statement. As a result, they argue, AHS's failure to deposit the excess receivables in the amount noted in the February 14, 2006 final collection statement constitutes a breach of section 3.2(f) of the agreement.

AHS argues that the agreement is ambiguous and did not preclude the company from correcting the collection statement within the thirty day period provided to the shareholder

5

representatives to dispute the statement. It also contends that the shareholder representatives knew full well that the February 14, 2006 collection statement contained a computational error and thus did not act in good faith in attempting to seize on the mistake. AHS argues that summary judgment is premature until the parties can conduct discovery on the amount that Ultra Care actually collected.

Contract interpretation is primarily a question of law. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). Under Illinois law, a court's chief aim when construing a contract "is to give effect to the parties' intent . . . [T]o discover this intent the various contract provisions must be viewed as a whole." *Home Ins. Co. v. Chicago & N.W. Transp. Co.*, 56 F.3d 763, 767 (7th Cir. 1995) (internal citations omitted).

Because Illinois adheres to the "four corners" rule of contract interpretation, the writing "must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Air Safety, Inc. v . Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999) (citation omitted). If, however, a court determines that the "contract is susceptible to more than one meaning, then an ambiguity is present." *Id.* An ambiguity that is apparent simply from reading a contract is referred to as a patent or intrinsic ambiguity; extrinsic evidence is admissible to cure that ambiguity. *Rossetto v. Pabst Brewing Co.*, 217 F.23d 539, 543 (7th Cir. 2000). In contrast, a latent ambiguity "is an ambiguity . . . that is recognized as such only when a contract clear on its face – that is, to an uninformed reader – is applied to a particular dispute." *Id.* Proof of a latent ambiguity must come from "objective" facts "in the sense . . . that establishing the fact [does] not require determining the credibility of a

party's self-serving testimony." *Id.*

As noted above, the primary goal in construing a contract is to ascertain the parties' intent. *Home Ins. Co.*, 56 F.3d at 767. To do this, a court "must analyze the specific words used in conjunction with the circumstances under which they were drafted." *Diaz v. Home Fed. Sav. and Loan Ass'n of Elgin*, 337 Ill. App. 3d 722, 727, 786 N.E.2d 1033, 1039 (2002) (internal quotation marks and citation omitted). To put it another way, a contract provision cannot be read in a vacuum.

The provisions of the merger agreement that describe who is to pay what to whom are set forth in sections 3.2(e) and 3.2(f). It is readily apparent from these provisions that the parties' intent was to ensure that payment was to be based upon Ultra Care's actual collections of receivables. Section 3.2(e) says that if, as of the end of the collection period, Ultra Care has not collected at least $6,900,000, then the shortfall is to be paid to AHS out of funds escrowed by the former shareholders. Section 3.2(f) says that if, as of the end of the collection period, Ultra Care has collected more than $6,900,000, then AHS is to deposit the excess with the former shareholders' agent.

Nothing in either of these provisions suggests that the parties intended payment to be based on anything other than Ultra Care's actual collections. The only possible exception to this is the reference in sections 3.2(e) and 3.2(f) to the amount that Ultra Care has "collected (or [is] deemed to have collected)." The parenthetical "deemed" reference relates back to section 3.2(b), which provides that if AHS does not comply with certain "collection procedures," it will be deemed to have collected a particular sum during each interim collection period. Aside from that exception, which did not come into play in the interim periods, it is clear that the parties intended

7

payment to be based on the amount that Ultra Care actually collected.

The provision of the agreement upon which the shareholder representatives rely in seeking summary judgment, section 3.2(d), does nothing to alter the parties' readily apparent intent regarding the amount to be paid. The primary purpose of this provision, together with section 3.2(c), is to describe how the amount collected by Ultra Care will be determined and how disputes will be resolved. As noted earlier, section 3.2(c) says that AHS is to deliver a collection statement within forty-five days after the end of the collection period. Section 3.2(d) says that this statement will be deemed final and binding on AHS and the former shareholders unless the shareholder representatives deliver a notice of dispute within thirty days after they receive the statement – in which case a dispute resolution procedure kicks in. The Court sees nothing in these provisions that suggests an intent to require payment to be based upon anything other than the amount actually collected by Ultra Care during the collection period.

It is true, as the shareholder representatives point out, that section 3.2(d) expressly provides a procedure for the shareholder representatives to challenge the accuracy of the collection statement without providing a procedure for its correction by AHS. But by the same token, nothing in section 3.2(d) expressly precludes correction of the collection statement by AHS. The agreement is, in effect, silent on this point.

Section 3.2(c), which requires AHS to deliver the collection statement within forty-five days after the end of the collection period, arguably may be read as precluding correction of the collection statement by AHS once that time has run. But that would make sense only if section 3.2(c) were read in a vacuum. Interpreting section 3.2(c) to prevent AHS from promptly correcting a computational error would be contrary to the overarching purpose of section 3 in its

entirety, which is to require payment to be based on Ultra Care's actual collections of receivables.

As discussed earlier, AHS corrected the collection statement just over two weeks after it had, on February 14, 2006, sent out the initial version. In the interim, the shareholder representatives had advised AHS via their counsel that they agreed with the February 14 statement and wanted to know how it would be distributed. The Court sees nothing in any provision of section 3 of the agreement that, in effect, allows the shareholder representatives (or anyone else) to fix the collection amount before the end of the thirty day period described in section 3.2(d).

The Court also notes that AHS has offered evidence from which a reasonable fact finder could determine that the shareholder representatives were well aware that the February 14 statement contained a $1.5 million-plus error in their favor. A reasonable fact finder could find that the shareholder representatives attempted to seize on this favorable error by trying to gavel section 3.2(d)'s thirty day period to a close before the error could be discovered. Interpreting the agreement to permit this would be contrary to the implied covenant of good faith and fair dealing that, under Illinois law, is implied in every contract. *See Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 296, 751 N.E.2d 1126, 1131 (2001). This covenant "ensures that parties do not try to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract." *Id.* (quoting *Cramer v. Ins. Exch. Agency*, 174 Ill. 2d 513, 524, 675 N.E.2d 897, 9023 (1996)). "[W]here an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter

9

construction shall be adopted." *Martindell v. Lake Shore Nat'l Bank*, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690 (1958).

In sum, the Court rejects the shareholder representatives' contention that the merger agreement unambiguously precluded AHS from correcting the collection statement within the period provided for the shareholders to dispute it. Rather, as discussed above, the agreement was ambiguous in this regard. For this reason, the shareholder representatives are not entitled to summary judgment.

## Conclusion

The Court denies plaintiffs' motion for summary judgment for the reasons stated above [docket no. 27]. The stay of discovery previously imposed by the Court is lifted. The case is set for a status hearing on April 19, 2007 at 9:30 a.m. for the purpose of setting a discovery schedule and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 11, 2007